764 N.W.2d 874 (2009)
277 Neb. 709
STATE of Nebraska ex rel. COUNSEL FOR DISCIPLINE OF the NEBRASKA SUPREME COURT, relator,
v.
Phillip G. WRIGHT, respondent.
No. S-07-119.
Supreme Court of Nebraska.
May 8, 2009.
*878 Kent L. Frobish, Assistant Counsel for Discipline, for relator.
Clarence E. Mock III and Denise E. Frost, of Johnson & Mock, Oakland, for respondent.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.
PER CURIAM.

I. INTRODUCTION
The office of the Counsel for Discipline of the Nebraska Supreme Court filed formal charges against respondent, Phillip G. Wright. Following a hearing, the referee concluded that Wright had violated various provisions of the Nebraska Code of Professional Responsibility and of the Nebraska Rules of Professional Conduct, as well as Neb.Rev.Stat. § 7-104 (Reissue 2007). The referee recommended a suspension for 1 year, followed by 2 years' monitored probation. In addition, the referee recommended that Wright be required to take a course in law office management and proper trust account practices and also to repay clients for excessive fees charged by Wright.

II. FACTUAL BACKGROUND
Wright is an attorney licensed to practice law in Nebraska. His practice is based in Omaha, Nebraska. Wright has a general practice, though many of his cases appear to be personal injury, workers' compensation, and Social Security disability matters. Wright employs other attorneys to assist him with this practice. Two such attorneysDavid Handley and Eric Sagehornfiled a grievance against Wright on December 5, 2005, due to concerns over Wright's practices regarding office management. Handley and Sagehorn's grievance was investigated, and formal charges were filed. As amended, these formal charges involve 13 counts against Wright. Twelve counts involved Wright's representation of various clients; the final count involved a letter from Wright to Handley and Sagehorn.
Many of the charges against Wright involve similar conduct, but with respect to different clients. Where that is the case, for the sake of simplicity, we have consolidated our discussion of the relevant facts.

1. TIMELINESS IN PAYING CREDITORS
Wright was accused of failing to timely pay bills incurred by him in connection with his representation of clients in nine separate casesDiana Bryan, Elizabeth Calta, Kimberly Gibb, Elizabeth Ireland, Joan Johnson, Johnny McDowell, Merlie *879 Miller, Brandy Richards, and LaKeiya Titsworth. In all instances, the funds to repay these creditors had been withheld from the client following settlement and disbursement of the client's case; depending on the case, Wright did not pay the creditor until 6 to 12 months after settlement.
In connection with this allegation, Wright was accused of violating Canon 1, DR 1-102(A)(1), and Canon 9, DR 9-102(A) and (B), of the Code of Professional Responsibility and § 7-104 in matters involving eight clients and of violating Neb. Ct. R. of Prof. Cond. §§ 3-501.15 and 3-508.4 and § 7-104 in a matter involving one client. The referee concluded that Wright's conduct violated DR 1-102(A)(1), DR 9-102(B)(3) and (4), §§ 3-501.15 and 3-508.4, and § 7-104.

2. REFUNDING MONEY OWED TO CLIENTS
Wright was also accused of failing to timely refund money owed to a client. In the first instance, the Bryan case, a refund of $15 was received by Wright for a portion of a filing fee. The filing fee had been withheld from the client's settlement disbursement, but the refunded amount was not paid to Bryan until nearly 8 months after receipt by Wright.
In a second incident, another client, McDowell, had $22.50 withheld from a disbursement. Nineteen months later, McDowell settled another matter, with Wright again acting as counsel. This time $45.50 was withheld; this amount included the $22.50 previously withheld. Though it is not entirely clear from the record, McDowell was apparently later reimbursed.
In connection with these allegations in the Bryan and McDowell cases, Wright was accused of violating DR 1-102(A)(1), DR 9-102(A) and (B), and § 7-104. The referee concluded that Wright's conduct violated DR 1-102(A)(1), DR 9-102(B)(3) and (4), and § 7-104.

3. CHARGING EXCESSIVE FEES
The formal charges also alleged that Wright charged an excessive fee in several cases. First, in his representation of Bryan, Wright was accused of improperly retaining, as a fee, a reduction in a subrogation interest. The record shows that Wright, through his employee Handley, negotiated a reduction of $955.84 in a subrogation interest belonging to a medical lienholder. Wright's fee agreement allowed Wright to retain the entirety of this reduction as a fee. In connection with this allegation, Wright was charged and found to have violated DR 1-102(A)(1); Canon 2, DR 2-106; and § 7-104. The referee concluded that "the evidence is not clear and convincing that [Bryan] did not comprehend or assent to the terms of her written fee agreement," but that the fee was nevertheless excessive because it was in excess of the one-third contingency agreement she signed.
Wright was also accused of violating DR 2-106 by charging an excessive fee in his representation of Terrance Wallace. In this case, Wright's fee exceeded the 25 percent of a Social Security award received by Wallace. Generally speaking, under federal law, an attorney fee in a Social Security case can be no more than the lesser of 25 percent of an award or $4,000. Wallace was charged a fee of $1,035, but, based upon Wallace's award, Wright was entitled to only $154.50. The referee concluded there was clear and convincing evidence to prove this violation and recommended that Wright be ordered to repay Wallace $1,035.
Finally, Wright was charged both with charging an excessive fee and with handling a legal matter without adequate preparation, in violation of DR 1-102(A)(1), *880 (4), and (6); DR 2-106; and Canon 6, DR 6-101(A)(2), in the representation of David Sheldon. As a result of a large Social Security award made to Sheldon, Sheldon's disability insurer made a request to be repaid $13,920.44 in funds it argued were overpaid. Sheldon submitted these funds to Wright. Several days later, Wright informed Sheldon that he had found a loophole and that Sheldon did not owe the money. Wright then withheld a fee of $4,640.66, or approximately one-third of the alleged overpayment, and refunded the balance to Sheldon, who spent the money. The insurer subsequently demanded payment of the $13,920.44 and stopped paying Sheldon's disability check until the overpayment was repaid.
The referee concluded there was not clear and convincing evidence that Wright handled Sheldon's legal matter without adequate preparation, in violation of DR 6-101(A)(2). However, the referee did find clear and convincing evidence that Wright had violated DR 2-106 and § 7-104 by charging an excessive fee. The referee recommended that Wright be ordered to repay Sheldon $4,640.66.

4. MISUSING TRUST ACCOUNT
The Counsel for Discipline also alleged that in two separate representations, Wright misused his trust account. In the Gibb case, Wright advanced costs to Gibb out of Wright's trust account without having received any funds from or on behalf of Gibb. In the Titsworth representation, Wright deposited settlement proceeds into his trust account; then, rather than withdrawing his earned fee and the expenses withheld from the settlement, he wrote checks (including checks for matters unrelated to the Titsworth representation) directly on the trust account, essentially using it as a business expense account.
The Counsel for Discipline alleged that Wright's conduct in the Gibb case violated DR 1-102(A)(1) and (4), DR 9-102(A) and (B), and § 7-104 and that Wright's conduct in the Titsworth case violated §§ 3-501.15 and 3-508.4 and § 7-104.
The referee concluded that in the Gibb case, there was clear and convincing evidence that Wright was commingling funds, but that there was not clear and convincing evidence that in advancing funds to Gibb, Wright was using other clients' funds. As such, the referee found violations of DR 1-102(A)(1), DR 9-102(A) and (B), and § 7-104. And in the Titsworth case, the referee found violations of §§ 3-501.15 and 3-508.4 and § 7-104.

5. IMPROPERLY CHARGING FEES IN SOCIAL SECURITY CASES
Wright was also accused, in several separate instances, of failing to have his fees from Social Security cases approved by the court as required by federal law. In addition, he was also accused of altering a contingent fee agreement into an hourly agreement in some of those cases.
In connection with these allegations, Wright was charged with violating DR 1-102(A)(1), (4), and (6); DR 2-106; DR 9-102(A) and (B); and § 7-104. The referee found that in the cases of McDowell, Mike Robbins, Wallace, and Sheldon, Wright violated § 7-104 and failed to have his fee approved by the court.

6. LETTER TO HANDLEY AND SAGEHORN
Finally, as is noted above, the allegations against Wright originated in a grievance filed by Handley and Sagehorn, former Wright associates. The grievance was filed on December 5, 2005, after both attorneys had terminated their employment relationships with Wright. After receiving notice of the grievance, Wright wrote a letter to Handley and Sagehorn indicating that he would sue them for libel *881 and defamation unless they withdrew their grievance.
The Counsel for Discipline alleged that pursuant to Neb. Ct. R. § 3-322(A), reports of alleged misconduct are absolutely privileged and no lawsuit may be predicated upon such reports. The Counsel for Discipline thus contended that Wright's conduct in writing this letter was a violation of § 3-508.4(a) and (d) and Neb. Ct. R. of Prof. Cond. § 3-503.1. The referee found there was clear and convincing evidence that Wright violated § 3-508.4(d).

7. RECOMMENDED SANCTION
The referee recommended that Wright be suspended from the practice of law for 1 year and that upon reinstatement, he be placed on monitored probation for an additional 2 years. The referee also recommended that Wright be required to take a course in law office management and proper trust account practices and to repay Sheldon in the amount of $4,640.66 and Wallace in the amount of $1,035.

III. ASSIGNMENTS OF ERROR
Wright makes 28 separate assignments of error, which can generally be restated as two: (1) The referee erred in finding that Wright violated the Nebraska Code of Professional Responsibility and the Nebraska Rules of Professional Conduct, and (2) the referee erred in his recommended sanction.

IV. ANALYSIS
As an initial matter, we note that some of Wright's conduct now at issue occurred prior to September 1, 2005, and is governed by the now-superseded Code of Professional Responsibility, while other conduct occurred on or after September 1, the effective date of the Nebraska Rules of Professional Conduct, and is therefore governed by those rules.
[1] A proceeding to discipline an attorney is a trial de novo on the record, in which the Nebraska Supreme Court reaches a conclusion independent of the findings of the referee; provided, however, that where the credible evidence is in conflict on a material issue of fact, the court considers and may give weight to the fact that the referee heard and observed the witnesses and accepted one version of the facts rather than another.[1]
[2] Disciplinary charges against an attorney must be established by clear and convincing evidence.[2]
The allegations against Wright fall into the following categories: (1) timeliness in paying creditors, (2) refunding money owed to clients, (3) charging excessive fees, (4) misusing a trust account, (5) improperly charging fees in Social Security cases, and (6) the letter to Handley and Sagehorn. We generally discuss these allegations in the order in which they were addressed by the referee, and not necessarily by the severity of the conduct charged.

1. TIMELINESS IN PAYING CREDITORS
[3] Wright first argues that the referee erred in finding that he committed ethical violations by failing to timely pay the creditors of clients in instances in which such funds had been withheld from a client's settlement. The Counsel for Discipline alleged, and the referee found, that such misconduct was a violation of DR 1-102(A)(1) (violation of disciplinary rule), DR 9-102(B)(3) and (4), and § 7-104. DR 9-102 provides in relevant part:
(B) A lawyer shall:

*882 . . . .
(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to the client regarding them.
(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.
We conclude that there is not clear and convincing evidence that Wright violated DR 1-102(A)(1) and DR 9-102(B)(3) and (4). Unlike § 3-501.15(d), discussed below, DR 9-102(B)(3) and (4) do not address funds that might be owed to a third party. As such, any lack of timeliness by Wright in failing to repay his clients' creditors is not a violation of DR 1-102(A)(1), DR 9-102, or § 7-104.
We note that Wright's actions might be a violation of DR 6-101(A)(3), dealing with the neglect of a client matter. And indeed, the referee found a violation of this rule. However, with the exception of the Calta representation, in which the referee found no violations, DR 6-101(A)(3) was not charged by the Counsel for Discipline in connection with any of the counts regarding Wright's alleged lack of timeliness in paying creditors. Therefore, despite the referee's conclusion, we find no violation of DR 6-101(A)(3).
[4] The Counsel for Discipline also alleged, and the referee found, that Wright violated §§ 3-501.15 and 3-508.4(a) when he failed to repay the creditors of another client, Titsworth. Section 3-508.4(a) deals with the violation of a rule of professional conduct, while § 3-501.15 deals with safeguarding property and generally provides that an attorney must safeguard the property of a client and of third parties and notify and promptly pay a client or third parties funds belonging to them.
We conclude there is not clear and convincing evidence that Wright violated § 3-501.15 or § 3-508.4(a). Unlike the Code of Professional Responsibility, § 3-501.15(d) specifically provides that an attorney has an obligation to "promptly" deliver to any third party property belonging to that party. However, in the Titsworth case, Wright withheld the funds for the unpaid bills from Titsworth's settlement in September 2005 and had paid all outstanding debts by December. We decline to find that Wright did not "promptly" deliver those funds to the creditors when the bills were paid within 3 months of Titsworth's settlement.
We conclude there was not clear and convincing evidence presented that Wright violated DR 1-102(A)(1), DR 9-102(B)(3) and (4), § 3-501.15, § 3-508.4(a), or § 7-104.

2. REFUNDING MONEY OWED TO CLIENTS
Wright also argues that he did not engage in unethical activity when he failed to refund money to clients for periods up to 8 months. The referee found that Wright had violated DR 1-102(A)(1), DR 9-102(B)(3) and (4), and § 7-104 in both instances. DR 1-102(A)(1) provides that it is against the Code of Professional Responsibility to violate a disciplinary rule; DR 1-102(A)(4), which the Counsel for Discipline also charged Wright with violating in both instances, prohibits an attorney from engaging in activity involving dishonesty, fraud, deceit, or misrepresentation. DR 9-102(B)(3) and (4) are set forth above and deal with preserving the identity of client funds.

(a) Bryan Representation
[5] In the Bryan case, a $15 refund was received from the Douglas County clerk's office on July 12, 2005. This money was not refunded to Bryan until March 2006. We find no clear and convincing *883 evidence that Wright violated DR 9-102(B)(3) and (4) when he failed to promptly refund this money to Bryan. DR 9-102(B)(3) requires a lawyer to render appropriate accounts to a client, while DR 9-102(B)(4) requires a lawyer to promptly pay a client as requested. In this case, Wright's failure to promptly refund funds owed to Bryan falls into neither category. Nor do we believe the record supports a finding that Wright's actions constituted conduct involving fraud, dishonesty, deceit, or misrepresentation in violation of DR 1-102(A)(4).
[6] However, Wright's failure to timely refund this money does fall within DR 9-102(B)(1), which was charged by the Counsel for Discipline and holds that a lawyer should promptly notify a client of the receipt of his or her funds. Because this court reviews this action de novo on the record, we can and do conclude that there was clear and convincing evidence of a violation of DR 1-102(A)(1), DR 9-102(B)(1), and § 7-104.

(b) McDowell Representation
[7, 8] With respect to the McDowell case, the same $22.50 was withheld from McDowell's settlements in two different casesonce in August 2003 and again in March 2005. The formal charges assert that Wright "fraudulently recovered this cost advance a second time." The referee, however, found that McDowell was repaid.
We conclude here, as we did with respect to the Bryan representation, that there was not clear and convincing evidence that Wright violated DR 1-102(A)(4) or DR 9-102(B)(4). However, we conclude there is clear and convincing evidence that Wright violated DR 1-102(A)(1), DR 9-102(B)(3), and § 7-104 by recovering the $22.50 from McDowell twice. Even assuming that Wright eventually did reimburse McDowell, by withholding funds twice to pay the same bill, Wright failed to render appropriate accounts to McDowell as required by DR 9-102(B)(3).

3. CHARGING EXCESSIVE FEES
Wright next argues that the referee erred in finding that he charged Bryan, Wallace, and Sheldon excessive fees.

(a) Bryan Representation
[9] In the Bryan case, Handley, on Wright's behalf, negotiated and reduced the subrogated interest of a medical lienholder by $955.84. Wright retained the entire amount of the reduction as a fee, which was allowed by Bryan and Wright's contingent fee agreement. The referee concluded that "the evidence is not clear and convincing that [Bryan] did not comprehend or assent to the terms of her written fee agreement," but nevertheless determined that Wright charged an excessive fee. The referee found a violation of DR 1-102(A)(1), DR 2-106, and § 7-104.
A review of Wright's brief reveals Wright's primary defense to be that his fee agreement with Bryan allowed Wright to retain any reduction in subrogation interests and that Bryan understood and did not complain about that provision.
It is true that Wright's agreement provided that he could retain the reduction in the lien in this case. And we agree with the referee that there was not clear and convincing evidence presented that Bryan did not understand this at the time she signed the agreement. But, as we recently noted in Hauptman, O'Brien v. Turco,[3] what is permitted by the fee agreement is only part of this court's consideration. We also are concerned with whether the fee charged was reasonable. And we conclude this fee was not reasonable.
*884 [10, 11] Wright indicated at his hearing that the "Hauptman O'Brien" case dealing with the "common fund doctrine" authorized him to retain this reduction in the subrogation interest. It appears that Wright was referring to Hauptman, O'Brien v. Milwaukee Guardian,[4] a decision rendered by the Nebraska Court of Appeals. In that case, the Court of Appeals explained:
[T]he common fund doctrine applies when an attorney (1) expends time and effort in (2) creating a common fund in which others are interested, and (3) the party with the subrogation interest has substantially benefited from the attorney's efforts in creating the fund. Additionally, the amount of the attorney fee awarded does not necessarily correspond with the contract between the attorney and the insured, but instead depends on the nature of the services rendered and the general considerations applicable to court awards of attorney fees.[5]
Thus, an attorney is allowed to retain at least a portion of the reduction in a lienholder's subrogated interest as compensation for the work done by the attorney in obtaining the settlement or award which allows payment by the plaintiff to his or her lienholders.
The purpose of the common fund doctrine was to require a lienholder, as one who shared in the work of the attorney, to also share in the costs of that representation; it was not intended as a means to allow an attorney to be paid two (or more) times by different parties for the same services. But the latter is exactly what occurred in this case. In addition to receiving his one-third of Bryan's settlement under the fee agreement, Wright retained the $955.84 from the reduction in the lien. In doing so, Wright was paid twice for doing the same work$955.84 by the lienholder and $13,666.73 by Bryan. We conclude there is clear and convincing evidence that Wright violated DR 1-102(A)(1), DR 2-106, and § 7-104. We further order Wright to repay to Bryan the excessive fee he charged in the amount of $955.84.

(b) Wallace Representation
[12] Wright was also found to have violated DR 2-106 and § 7-104 by charging an excessive fee in the Wallace representation. In Wallace, initially there was no written fee agreement. Some months into the representation, Wallace agreed to an hourly fee agreement. Irrespective of this agreement, however, Wright's fee was limited by federal law to the lesser of 25 percent of back benefits or $4,000.
Prior to the award of Wallace's Social Security benefits, a fee of $1,035 (based on this hourly fee agreement) was deducted from Wallace's separate workers' compensation settlement. Wallace's Social Security award was entered in December 2004 in the amount of $309 monthly beginning in October 2004. Wallace's total award to that date was therefore $618. Based upon this award, at the time Wright charged the $1,035 fee, he could have applied for approval of a fee of no more than 25 percent of the $618 amount, for a total of just $154.50.
It is axiomatic that $1,035 is an excessive fee when the fee should have been limited to just $154.50. We therefore find clear and convincing evidence that Wright violated DR 2-106 in charging this fee. Moreover, we agree with the referee that Wright should repay $1,035 to Wallace.

(c) Sheldon Representation
[13] Wright next alleges that the referee erred in finding that he charged an *885 excessive fee in connection with his representation of Sheldon. The referee found clear and convincing evidence that Wright violated DR 2-106 and § 7-104.
In this case, Sheldon remitted to Wright $13,920.44 pursuant to a request from Sheldon's disability insurer. According to the insurer, the amount was an overpayment of disability payments. Wright retained the money for a few days, then withheld $4,640.66 and returned the rest to Sheldon on November 26, 2004. At this time, Wright indicated that Sheldon did not need to pay the money. But in August 2005, the insurer again requested that Sheldon refund the overpayment; by this point, Sheldon had spent the money.
Wright argues that he had reached an agreement with the insurer that Sheldon did not have to refund the overpayment. There is evidence in the record that Wright was in the process of negotiating with the insurer regarding the overpayment. But there is no evidence, other than Wright's testimony, that an agreement had been reached. For this advice, Wright charged Sheldon $4,640.66. We find that such is clear and convincing evidence that Wright charged an excessive fee in violation of DR 2-106 and § 7-104. In addition, we agree with the referee that Wright should repay to Sheldon the $4,640.66 fee.

4. MISUSING TRUST ACCOUNT
Next, Wright contends the referee erred in finding that he committed several trust account violations. Wright was accused of, and the referee found, various trust account violations contrary to DR 1-102(A)(1) and DR 9-102(A) and (B) of the Code of Professional Responsibility and §§ 3-501.15 and 3-508.4(a) of the Nebraska Rules of Professional Conduct. The basis for these allegations arose in the Gibb and Titsworth representations. In both instances, Wright was accused of using his trust account as a business expense account. In the Gibb representation, Wright advanced costs to Gibb from his trust account though no funds in the trust account belonged to Gibb. And in the Titsworth representation, Wright deposited her settlement proceeds, then paid directly from the trust account a number of expenses unrelated to Titsworth's case.
DR 9-102(A) provides:
All funds of clients paid to a lawyer or law firm shall be deposited in an identifiable account or accounts maintained in the state in which the law office is situated in one or more state or federally chartered banks, savings banks, savings and loan associations, or building and loan associations insured by the Federal Deposit Insurance Corporation, and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:
(1) Funds reasonably sufficient to pay account charges may be deposited therein.
(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.
DR 9-102(B) is set forth in part above and generally provides that a lawyer shall promptly notify a client of the receipt of his or her funds or other property, safeguard client securities or property, maintain complete records, and promptly pay or deliver funds or property to a client upon request.
Section 3-501.15 generally requires an attorney to safeguard the property of a client and of third parties and to notify and *886 promptly pay a client or third parties funds belonging to them. And § 3-508.4(a) makes it professional misconduct to knowingly violate a rule of professional conduct.

(a) Gibb Representation
[14] Turning first to the Gibb representation, Wright is accused of not withdrawing the full amount of his earned fee from his trust account at the time it was earned, and instead leaving a portion of that fee in his trust account. However, there is nothing in DR 9-102 that explicitly requires an attorney to withdraw funds upon earning them. DR 9-102(A)(2) states in part that "the portion belonging to the lawyer or law firm may be withdrawn when due" but does not impose an absolute requirement that the funds be withdrawn. And while DR 9-102(B)(3) requires an attorney to keep complete records, there is no evidence that such records were not kept. The only allegation against Wright is that the funds were not withdrawn. We therefore conclude there is not clear and convincing evidence that Wright violated DR 1-102(A)(1) or DR 9-102(A) and (B).

(b) Titsworth Representation
[15] In the Titsworth representation, Wright was accused of not promptly paying Titsworth and her creditors and of not withdrawing all of his earned fees. According to the Counsel for Discipline, Wright used the account as a business expense account, advancing costs to other clients. But as with DR 9-102, there is nothing in § 3-501.15 that specifically states when earned fees must be withdrawn; rather, it provides only a prohibition against withdrawing any client money until it is earned or until expenses are incurred. In this case, Wright stands accused of not withdrawing his earned fee promptly, but is not accused of withdrawing funds he did not earn.
We conclude that there is not clear and convincing evidence that Wright violated § 3-501.15 or § 3-508.4(a). However, we note that as with DR 9-102, § 3-501.15 requires an attorney to keep complete records of account funds. Practices such as Wright's could lead to problems with recordkeeping and are therefore discouraged.

5. IMPROPERLY CHARGING FEES IN SOCIAL SECURITY CASES
Other allegations against Wright involved the fees he charged in four Social Security casesthose involving McDowell, Robbins, Wallace, and Sheldon. Wright asserts the referee erred in finding ethical violations in Wright's failure to get certain fees approved and in Wright's modifying contingent fee agreements into hourly fee agreements.
[16, 17] We first address Wright's failure to get his fees approved by the court as required by federal law. The referee concluded Wright's actions violated his oath of office as an attorney under § 7-104. Wright argued that he failed to have the fees approved because at the time, he believed the particular fees did not need approval.
In addition to an alleged violation of § 7-104, the Counsel for Discipline also charged Wright with violations of DR 1-102(A)(1), (4), and (6). DR 1-102(A)(1) is violated when another disciplinary rule is violated, while DR 1-102(A)(4) provides that a lawyer should not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. DR 1-102(A)(6) provides that an attorney should not "[e]ngage in any other conduct that adversely reflects on his or her fitness to practice law."
We agree with the referee that Wright's interpretation of federal law was not entirely unreasonable, given language in 42 U.S.C. § 406 (Supp. V 2005) which provides *887 that fees under a certain amount "shall" be approved. Nevertheless, approval was required and was not sought in these cases.
Because there is evidence that Wright's failure was not done in bad faith, but instead was the result of a misinterpretation of the relevant law, we conclude there is not clear and convincing evidence that Wright engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation. However, Wright did fail to gain court approval of fees when required to do so by federal law. We determine that this failure to follow the law is conduct that reflects adversely upon Wright's fitness to practice law. We therefore conclude that there is clear and convincing evidence that Wright violated DR 1-102(A)(1) and (6), as well his oath of office as an attorney under § 7-104, when he failed to have these fees approved.
[18, 19] We next turn to the issue of whether Wright violated any ethical rules when he modified certain contingent fee agreements into hourly fee agreements. A fee agreement between an attorney and a client is an enforceable contract, whether oral or written,[6] and thus may be modified by the agreement of the parties.[7] Wright indicated that the parties agreed to the modifications of the agreement, and there is no evidence to contradict this. We therefore conclude there was not clear and convincing evidence to show that any charged ethical violations occurred by virtue of the modification of these fee agreements.

6. LETTER TO HANDLEY AND SAGEHORN
[20] Finally, Wright argues that the referee erred in finding that he violated any ethics rules by threatening to sue Handley and Sagehorn if they did not withdraw their complaint. In the formal charges, the Counsel for Discipline alleged that Wright's conduct in writing the letter was a violation of §§ 3-503.1 and 3-508.4(a) and (d). The referee found that Wright violated § 3-508.4(d) (engaging in conduct prejudicial to the administration of justice). Wright admits writing the letter, but argues that the letter was directed at making Handley and Sagehorn cease defaming him to his clients and stopping Handley from trying to extort money from him by requesting the payment of compensation to which Handley was not entitled.
We conclude there was clear and convincing evidence that Wright violated § 3-508.4(d) by writing the letter. Contrary to Wright's assertion, a review of the letter in question makes no reference to communications to clients or Handley's request for compensation. Instead, a plain reading of that letter indicates the letter was intended to do exactly what the Counsel for Discipline is alleging in this action threatening to sue if the grievance was not withdrawn. Such is contrary to § 3-322(A), which states that reports of alleged misconduct are absolutely privileged and that no lawsuit may be predicated upon such reports. We therefore find that there is clear and convincing evidence of a violation of § 3-508.4(d).

7. APPROPRIATE DISCIPLINE
Finally, we turn to the question of the appropriate discipline. Neb. Ct. R. § 3-304 states that the following may be considered as discipline for attorney misconduct:
(A) Misconduct shall be grounds for:
(1) Disbarment by the Court; or
(2) Suspension by the Court; or

*888 (3) Probation by the Court in lieu of or subsequent to suspension, on such terms as the Court may designate; or
(4) Censure and reprimand by the Court[.]
. . . .
(B) The Court may, in its discretion, impose one or more of the disciplinary sanctions set forth above.
[21-23] Each attorney discipline case must be evaluated individually in light of its particular facts and circumstances.[8] This court will consider the attorney's acts both underlying the alleged misconduct and throughout the proceeding.[9] The determination of an appropriate penalty to be imposed on an attorney in a disciplinary proceeding also requires the consideration of any aggravating or mitigating factors.[10]
[24] The referee recommended that Wright be suspended for 1 year, to be followed by 2 years of monitored probation, and also that Wright be required to repay Wallace and Sheldon the excessive fees he charged. In addition, the referee recommended that Wright be required to take courses in law office management. The Counsel for Discipline suggests that suspension for up to 2 years would be appropriate, but did not take exception to the 1-year suspension recommended by the referee.
In State ex rel. Counsel for Dis. v. Widtfeldt,[11] we suspended an attorney for 1 year for charging excessive fees in two separate probate proceedings, though we noted that the attorney was currently suspended as a result of different charges. And in State ex rel. NSBA v. Mefferd,[12] we suspended an attorney for 1 year for, among other violations, failing to properly account for and refund an overpayment to clients.
In this case, Wright has been found to have committed numerous violations of the Rules of Professional Conduct and the Code of Professional Responsibility. We are particularly disturbed by Wright's charging of excessive fees. With respect to Bryan, Wright's retention of the reduction in the subrogation interest effectively resulted in his being paid twice for the same work. And in the Sheldon case, Wright withheld a fee from Sheldon's overpayment and returned the balance to Sheldon, even though there is no evidence other than Wright's testimony that an agreement had been reached with the insurer regarding the overpayment. And the fee in the Wallace case greatly exceeded the amount to which Wright was entitled under federal law.
Also of concern to us is the letter Wright wrote to Handley and Sagehorn threatening suit if they did not withdraw the complaint filed against him. As is noted above, we do not find Wright's explanation convincing, and this court will not condone Wright's actions in writing this letter. If indeed Wright was concerned that the allegations against him were made in an attempt to defame or extort from him, such an explanation should have been proffered to the Counsel for Discipline.
We do take into consideration, in mitigation, letters written in support of Wright, as well as the fact that Wright is active in his local community. And apparently, Wright cooperated with the Counsel for Discipline's investigation into this matter. *889 We further note that at least in some respects, Wright has taken responsibility for his actions, in that he has indicated he has taken steps to learn and implement better office management techniques. Yet, Wright has not taken full responsibility for his actions; it is evident from the record that Wright still blames Handley and Sagehorn for the charges filed against him.
We therefore conclude that Wright should be and hereby is suspended from the practice of law for a period of 9 months, effective immediately. Following the completion of that suspension, Wright shall be placed on monitored probation for a period of 2 years. In addition, we order Wright to complete a course in law office management and to repay the excessive fees charged to Bryan, Wallace, and Sheldon.

V. CONCLUSION
We find by clear and convincing evidence that Wright violated various provisions of the Code of Professional Responsibility and Rules of Professional Conduct. It is the judgment of this court that Wright be suspended from the practice of law for a period of 9 months, effective immediately. Following that suspension, Wright shall be placed on monitored probation for a period of 2 years. In addition, Wright shall complete a course in law office management.
Wright shall comply with Neb. Ct. R. § 3-316 and, upon failure to do so, shall be subject to a punishment for contempt of this court. At the end of his suspension period, Wright may apply to be reinstated to the practice of law, provided that he has paid restitution to Bryan, Wallace, and Sheldon; that he has demonstrated his compliance with § 3-316; and, further, that the Counsel for Discipline has not notified this court that Wright has violated any disciplinary rule during his suspension. We also direct Wright to pay costs and expenses in accordance with Neb.Rev. Stat. §§ 7-114 and 7-115 (Reissue 2007) and Neb. Ct. R. §§ 3-310(P) and 3-323(B) within 60 days after an order imposing costs and expenses, if any, is entered by this court.
JUDGMENT OF SUSPENSION.
MILLER-LERMAN, J., not participating.
NOTES
[1] State ex rel. Counsel for Dis. v. Rokahr, 267 Neb. 436, 675 N.W.2d 117 (2004).
[2] Id.
[3] Hauptman, O'Brien v. Turco, 273 Neb. 924, 735 N.W.2d 368 (2007).
[4] Hauptman, O'Brien v. Milwaukee Guardian, 7 Neb.App. 60, 578 N.W.2d 83 (1998).
[5] Id. at 66, 578 N.W.2d at 87.
[6] See Sherrets, Smith v. MJ Optical, Inc., 259 Neb. 424, 610 N.W.2d 413 (2000).
[7] See, generally, Pennfield Oil Co. v. Winstrom, 272 Neb. 219, 720 N.W.2d 886 (2006).
[8] State ex rel. Counsel for Dis. v. Orr, 277 Neb. 102, 759 N.W.2d 702 (2009).
[9] Id.
[10] Id.
[11] State ex rel. Counsel for Dis. v. Widtfeldt, 271 Neb. 851, 716 N.W.2d 68 (2006).
[12] State ex rel. NSBA v. Mefferd, 258 Neb. 616, 604 N.W.2d 839 (2000).